**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

JAMES FENTON, JR.,         )
                              )
      Petitioner,         )        Case No. 3:09-1057
                              )        Chief Judge Haynes
v.                          )
                              )
RONALD COLSON, Warden,    )
                              )
      Respondent.       )

## M E M O R A N D U M

Petitioner, James Fenton, Jr, filed this pro se action under 28 U.S.C.§ 2254 seeking the writ

of habeas corpus to set aside his state conviction for especially aggravated robbery for which he

received a sentence of twenty years. After a review of the pro se petition, the Court appointed the

Federal Public Defender and granted leave to file an amended petition. In his amended petition,

Petitioner asserts the following claims: (1) ineffective assistance of counsel for counsel's failures to

locate and interview key witnesses and (2) insufficient evidence to support the conviction. The Court

held an evidentiary hearing on whether Petitioner could establish the requisite cause and prejudice

as well as his actual innocence to excuse his procedural defaults of the ineffective assistance of

counsel claims in his amended petition.

### A. Procedural History

On May 7, 2004, Petitioner was indicted for especially aggravated robbery and after a trial,

a jury convicted him and the state trial court imposed a sentence of twenty years. On direct appeal,

the Tennessee Court of Criminal Appeals affirmed his conviction and sentence. State v. Fenton,

M2005-01761-CCA-R3-CD, 2006 WL 1896363 (Tenn. Ct. Crim. App. Oct. 2, 2008). The Tennessee

Supreme Court denied his application for permission to appeal. Id. at *1.

During the pendency of his direct appeal, on February 5, 2007, Petitioner filed his pro se petition for post-conviction relief. (Docket Entry No. 18-7 at 52). The trial court appointed counsel who filed an amended petition. Id. at 57. After an evidentiary hearing, the trial court denied the petition. On appeal, the Tennessee Court of Criminal Appeals affirmed the trial court's order. Fenton v. State, No. M2007-01661-CCA-R3-PC, 2008 WL 4457051 (Tenn. Ct. Crim. App. Oct. 2, 2008). On February 17, 2009, the Tennessee Supreme Court denied his application for permission to appeal. Id. at *1. Pertinent here, is that in Petitioner's appellate brief for his post-conviction appeal, his ineffective assistance of counsel claims was stated as:

Whether the post-conviction court erred in finding trial counsel was not ineffective despite his failure to:

(A.) Adequately Prepare for Trial.

(B.) Thoroughly Investigate an Alibi Witness.

(C.) Adequately Investigate the Facts of Appellant's Case

(D.) Provide the Petitioner with a Copy of Discovery.

(Docket Entry No. 18-9 at100). These claims were predicated on different factual bases the claims that give rise to the procedural default issues.

## B. Review of the State Record

The facts underlying the Petitioner's conviction were found by the Tennessee Court of Criminal Appeals as follows:

> On January 7, 2004, the victim, Lindell Graves, was preparing to leave his apartment when two men, one armed with a handgun, entered the residence, beat him, and took his money and jewelry. At trial, the victim testified that he heard a knock at the door, looked through the peephole, and saw two men standing in the hallway. The face of one of the men was obstructed by a box and the other man was wearing "clear frame glasses with little gold things on them and ... a light brown scarf around his neck that came to [the very bottom of his chin]." As the victim opened the door, the two men

"rushed ... through the door," knocking him "through the wall ." The victim recognized the man wearing the glasses and scarf as the defendant, with whom he had been acquainted for some time. He did not recognize the other man, who had "brown hair and a little moustache." The defendant struck the victim in the head with a nine millimeter handgun, threatened to kill him, and demanded his money. The other man searched his bedroom, tossing the furniture as he did so. When the victim claimed that he had no money, the defendant hit him in the mouth with the gun, breaking his jaw and shattering his teeth. The two men robbed the victim of his coat, a gold chain, rings, a watch, and the cash from his pocket. During the attack, the defendant remarked that the victim's brother, Josh, had informed him that the victim had recently received a large income tax refund.

As he left the residence, the defendant grabbed the victim's cell phone and ordered him to lie on the floor for ten minutes. After a short time, the victim crawled to an upstairs apartment, where a neighbor called 911. As a result of the beating, the victim suffered continuous headaches and could not eat solid food for several months. At the time of the trial, he faced additional surgery and further treatment expected to cost upwards of $10,000. A few days after the robbery, the victim telephoned the defendant, who denied participation in the robbery but said, "I kept the dude from beating your ass." Several weeks after the offense, the victim identified the defendant from a photographic lineup.

The victim admitted that he did not immediately identify the defendant as one of the assailants, explaining that he was "dazed and confused" as a result of his injuries. While acknowledging that "Joshua" was listed in the police report as "suspect number one," the victim denied telling police that anyone by that name had committed the robbery. The victim explained that during his initial interview with police, he made reference to his brother, Josh, because the defendant had mentioned his name as his source of knowledge about the tax refund.

The victim's fiancee, Audrey Duke, was at work on the night of the offense when she was notified that he had been hospitalized. When she arrived at the hospital, she observed that the victim's "mouth was all busted up. He had a big patch of hair out. He was just bleeding all over. His ... lips were busted. All [of his teeth had been] knocked out." A few days after the robbery, as Ms. Duke dropped off the victim's son at school, the defendant approached her and said that he "had a beef with" the victim and "was going to get him." When she returned to her residence, she asked the victim to telephone the defendant and then overheard the defendant claim that he had "stopped the dude from beating him." At that point, she took the phone and told the defendant that she had recorded the statement. According to Ms. Duke, the defendant responded, "[S]ee, I warned you. Now you're going to get hurt."

3

Officer Troy Gossett of the Metro Police Department responded to the robbery call and took the initial statement from the victim. Officer Gossett testified that there was "a misunderstanding" and that he inadvertently placed the victim's brother's name in the suspect box on his report. He explained that he cleared up the error in the narrative portion of his report. He testified that the victim listed the items taken as a "wallet with miscellaneous identifications and five hundred dollars in cash, a gold nugget watch, an eighteen-inch fourteen carat gold rope chain with a half carat diamond pendant, a nugget ring, a cross ring with diamonds on it, a cell phone, and a set of keys."

Detective Chad Gish, who received the initial report from Officer Gossett, did not conduct any follow-up investigation until two days later. He recalled that he asked the victim to come to the police station to give a statement but the victim, because of his injuries, was not able to do so until three weeks after the offense. During the initial conversation, the victim reported to the officer that the defendant had committed the robbery. Later, he identified the defendant from a photographic lineup.

Fenton, 2006 WL 1896363 at *1-2.

## C. The Federal Habeas Hearing

For his federal ineffective assistance of counsel claims, Petitioner relies on proof that was not presented to the state courts. At the evidentiary hearing in this action, Tiffany Sanderson McNeal, Petitioner's former common law wife who has now remarried, testified that she knew the victim Lindell Graves from whom she received various drugs. McNeal attended wrestling matches with Graves. McNeal described her relationship with Graves as varying from good to bad.

In essence, about a week after the robbery, McNeal testified that Graves told her that his younger brother robbed him and told McNeal to stay away from his younger brother. According to McNeal, Graves told her that he identified Petitioner as the robber to avoid a prison sentence for his younger brother.

McNeal, who was living with Petitioner, told Petitioner of the robbery of Graves. In McNeal's opinion, Petitioner did not commit the robbery because he never displayed that kind of

4

behavior.[1] McNeal also checked Petitioner's clothes regularly for notes from other women because Petitioner had been cheating on her. Throughout these times, McNeal never observed any drugs or money. After threats to Petitioner, McNeal left the shared residence with her children. McNeal, however, was present when the police officers arrested Petitioner and knew the nature of the charge against Petitioner. McNeal, however, could not remember whether she told the police officers about Graves's statement when the officers arrested Petitioner.

McNeal was not living with Petitioner at the time of his trial, but knew Petitioner was in custody. McNeal states that she was aware of Petitioner's actual charges, but did not talk to him about the robbery or Graves's statement about who committed the robbery. McNeal never mentioned Graves's statement about his younger brother as the actual robber to Petitioner nor his state trial counsel. During these times, McNeal was consuming marijuana and pills. McNeal is currently in custody for violation of her parole and Petitioner's family has custody of her children. McNeal has four prior felony convictions, including obtaining drugs and government benefits through fraud.

In his amended petition, Petitioner also alleged that other witnesses could have been called, but those witnesses' testimony was not presented at the evidentiary hearing in this action. Petitioner also cites his state post-conviction testimony that he told his post-conviction counsel to investigate McNeal and his post-conviction counsel purportedly asked specific questions about McNeal at the state post-conviction hearing. (Docket Entry No. 18-8 at 29). Yet, the state post conviction record

---

[1] Yet, the state post conviction record reflects that Petitioner had four or more "run-ins" with the victim (Docket Entry No. 18-8 at 30)

reflects that McNeal was cited as introducing a person named "Jamie" to Graves and the "lady" to whom Petitioner referred for investigation was a store employee at a store, not McNeal. Id. at 29-30.

In addition, Petitioner adds as a new claim that his state trial counsel did not effectively cross examine Graves about his initial identification of his assailants on the 911 call. There was proof at Petitioner's trial that in his 911 call, Graves initially responded to whether he could describe the assailants with "naw . . .no" and later stated that "they were white . . . and uh . . . and one was black," (Docket Entry No. 18-6 at 15-16). Graves is also reported to have stated in a police report on the same evening, that one of his assailants was "Joshua" who lived on Elm Street. (*See* Docket Entry No. 18-3, Trial Transcript, at 40-42 and Docket Entry No. 18-1, Police Report, at 77-79.) Graves's younger brother, Joshua, lived on Elm Street. (Docket Entry No. 18-3, Trial Transcript, at 40-41). The trial record establishes that the reference to Joshua was the police officer's error, Fenton, 2006WL 1896363 at *2, and that Graves's reference to Joshua was because the Petitioner told him during the robbery that Joshua told him about Graves recently receiving a large tax refund. Id. at *1.

Respondent contends that Petitioner did not present the state courts with his claims of ineffective assistance of counsel based upon McNeal's testimony at the federal hearing. Respondent notes that in his amended state petition for post-conviction relief, Petitioner alleged only that Graves and Sanderson had dated and her testimony "could have been used at trial to establish a motive for the allegations made by the victim." (Docket Entry No. 18-7 at 61).

### D. Conclusions of Law

For Petitioner's new claims of ineffective assistance of counsel, Respondent contends that given the state post-conviction statute of limitations, Tenn. Code Ann. §40-30-102(a) and the state

6

post conviction statute on waiver, Tenn. Code Ann. § 40-30-102(c), the procedural default doctrine precludes the Court's consideration of Petitioner's new ineffective assistance of counsel claims. Petitioner contends that his proof establishes cause and prejudice as well as his actual innocence for any procedural default of these claims under Martinez v. Ryan, 132 S. Ct. 1309 (2012). Respondent argues that Martinez does not apply to Tennessee's post conviction process nor to the facts of Petitioner's new claims. The Court first considers the threshold issues of procedural default and Martinez's applicability.

### 1. Procedural Default

"Procedural Default Doctrine" is an extension of the comity policy that underscores the exhaustion doctrine and bars consideration of a federal claim in a habeas action absent a showing of cause and prejudice or actual innocence. As defined by the Supreme Court, under this doctrine:

> [t]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. **This rule applies whether the state law ground is substantive or procedural**. In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. **Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory...**
>
> \*   \*   \*
>
> **... the doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement**. In these cases, the state judgment rests on an independent and adequate state procedural ground.

Coleman v. Thompson, 501 U.S.722, 729-30 (1992) (emphasis added and citations omitted).

The rationale for this doctrine arises out of federal respect for federalism and maintaining

comity with state courts:

> In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without a rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.

*   *   *

> [A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance. . . .In the absence of an independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the State's interest in correcting their own mistakes is respected in all federal habeas cases.

Id. at 730-32.

The Supreme Court further recognized that state procedural rules also serve a legitimate state

interest in finality of criminal convictions:

> [p]lainly the interest in finality is the same with regard to both federal and state prisoners. . . . There is no reason to . . . give greater preclusive effect to procedural defaults by federal defendants than to similar defaults by state defendants. To hold otherwise would reflect an anomalous and erroneous view of federal-state relations.

Francis v. Henderson, 425 U.S. 536, 542(1976) (quoting Kaufman v. United States, 394 U.S. 217,

228 (1969)).

In Murray v. Carrier, 477 U.S. 478 (1986), the Supreme Court noted that state procedural

rules channel the controversy to the state trial and appellate courts.

> [A] state's procedural rules serve vital purposes at trial, on appeal, and on state collateral attack . . . Each state's compliment of procedural rules . . . channel[s] to the extent possible, the resolution of various types of questions to the stage of the judicial process at which they can be resolved most fairly and efficiently. Failure to raise a

claim on appeal reduces the finality of appellate proceedings, deprives the appellate court of an opportunity to review trial error, and undercut[s] the state's ability to enforce its procedural rule[s].

Id. at 490-91 (quoting Engle v. Isaac, 456 U.S. 107, 129 (1982).

The procedural default doctrine applies only to firmly established and "regularly followed" state procedural rules. Johnson v. Mississippi, 486 U.S. 578, 587 (1988). Moreover, if the state court did not determine whether a petitioner's claims were procedurally defaulted under state law, then the District Court is to consider whether the state court would bar the claims, if those claims were presented to the state courts. Engle, 456 U.S. at 125-26, n.26. If the state decision is unclear, then the same rule obtains and the Court examines the briefs of the parties in the state courts. Bagby v. Sowders, 853 F.2d 1340, 1348 (6th Cir. 1988).

Once procedural default on a state rule is established, the federal petitioner must establish cause and prejudice to excuse such non-compliance. Carrier, 477 U.S. at 488. The procedural default doctrine also does not preclude federal habeas review if the petitioner has an error-free trial, but makes a showing of actual innocence of the offense with clear and convincing evidence that reveals a fundamental miscarriage of justice. Sawyer v. Whitley, 505 U.S. 333, 336 (1992).

In the Sixth Circuit, the analysis under the procedural default doctrine was set forth by the Court of Appeals in the oft-cited Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986):

> When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.

*　　*　　*

Second, the court must decide whether the state courts actually enforced the state procedural sanction.

\*   \*   \*

Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

Id. at 138 (citations omitted).

Here, McNeal's testimony is new evidence that the state court did not consider on any claims. Under that one year statute of limitations for the Tennessee Post Conviction Act, Tenn. Code Ann. § 40-30-102 (a), this doctrine would bar these claims in the amended petition as untimely. The waiver statute, Tenn. Code Ann. § 40-30-112(a) has been held to represent legitimate state interests that is regularly enforced for the procedural default analysis. See Cone v. Bell, 243 F.3d 961, 969 (6th Cir. 2001) overruled on other grounds, Bell v. Cone, 535 U.S. 685 (2002).

## 2. The Cause and Prejudice Requirement

The "cause" for a procedural default must be external to the petitioner and must otherwise be attributable to the state.

. . . **we think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule**. Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel, see Reed v. Ross, 468 U.S., at 16, or that 'some interference by officials,' Brown v. Allen, 344 U.S. 443, 486 (1953), made compliance impracticable, would constitute cause under this standard.

Carrier, 477 U.S. at 488 (emphasis added).

10

An often cited factor to establish cause for a procedural default is the petitioner's state counsel's failure to raise an issue or to comply with a state law to present a given habeas claim. Inadequate counsel can prove cause, but only if counsel's conduct violates Sixth Amendment standards <u>and</u> counsel's inadequate conduct has been presented to the state courts.

> So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in <u>Strickland v. Washington</u>, <u>supra</u>, we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default.

*   *   *

> **Similarly, if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not "conduc[t] trials at which persons who face incarceration must defend themselves without adequate legal assistance."** <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 344 (1980). **Ineffective assistance of counsel, then, is cause for a procedural default.** However, we think that the exhaustion doctrine, which is "principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings," <u>Rose v. Lundy</u>, 455 U.S. 509, 518 (1982), generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. The question whether there is cause for a procedural default does not pose any occasion for applying the exhaustion doctrine when the federal habeas court can adjudicate the question of cause--a question of federal law--without deciding an independent and unexhausted constitutional claim on the merits. **But if a petitioner could raise his ineffective assistance claim for the first time on federal habeas in order to show cause for a procedural default, the federal habeas court would find itself in the anomalous position of adjudicating an unexhausted constitutional claim for which state court review might still be available. The principle of comity that underlies the exhaustion doctrine would be ill served by a rule that allowed a federal district court "to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation,"** <u>Darr v. Burford</u>, 339 U.S. 200, 204 (1950), **and that holds true whether an ineffective assistance claim is asserted as cause for a procedural default or denominated as an independent ground for habeas relief.**

477 U.S. at 488-89 (emphasis added).

The Supreme Court emphasized in Coleman that mere attorney error cannot be cause and cannot be attributable to the state.

> Attorney ignorance or inadvertence is not "cause" because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must "bear the risk of attorney error. Attorney error that constitutes ineffective assistance of counsel is cause, however . . . as Carrier explains, "**if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the state." In other words, it is not the gravity of the attorney's error that matters, but that it constitutes a violation of petitioner's right to counsel, so that the error must be seen as an external factor, i.e., "imputed to the state**."

Coleman, 501 U.S. at 753-54 (emphasis added) (citations omitted).

As noted earlier, the standard for cause attributable to counsel is the constitutional standard under the Sixth Amendment for attorney performance, i.e., whether counsel provided "reasonably effective assistance." Strickland, 466 U.S. 668, 687 (1984). Under Strickland, counsel's performance must be both inadequate and prejudicial to the defense.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687.

In Engle, the Court ruled that absent an error of constitutional magnitude, trial strategy decisions of counsel could not establish cause, 456 U.S. at 133-34, unless the decision is of constitutional significance. Murray, 477 U.S. at 486-88. In Carrier, the Supreme Court made it clear that procedural defaults attributed to ignorance or the inadvertence of counsel or as a result of a deliberate appellate strategy that fails to raise a "particular claim" would preclude federal habeas

review of a claim. 477 U.S. at 487. "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default." 477 U.S. at 486-87. As to the failure to raise a claim on appeal, the Court also observed that "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of noncompliance, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983).

In Wainwright v. Torna, 455 U.S. 586 (1982), the Supreme Court made it clear that ineffective assistance of counsel could not be grounds for cause where the proceeding in which the error occurred was not one for which counsel was constitutionally required. Under Ross v. Moffitt, 417 U.S. 600, (1974) and Pennsylvania v. Finley, 481 U.S. 551, (1987), the right to counsel does not extend beyond the first appellate process. Thus, counsel errors in state post-conviction proceedings are not grounds for cause because there is no right to counsel for these proceedings, as the Court explained in Coleman,

> [W]e decline[] to extend the right to counsel beyond the first appeal of the criminal conviction. We held in Ross that neither the fundamental fairness required by the Due Process Clause nor the Fourteenth Amendment's equal protection guarantee necessitated that states provide counsel in state discretionary appeals where defendants already had one appeal as of right . . . Similarly, in Finley we held there was no right to counsel in state collateral proceedings after exhaustion of direct review. . . . Given that a criminal defendant has no right to counsel beyond his first appeal in pursuing state discretionary or collateral review, it would defy logic for us to hold that Coleman had a right to counsel to appeal a state collateral determination of his claims of trial error.

> Because Coleman had no right to counsel to pursue his appeal in state habeas, any attorney error that led to the default of Coleman's claims in state court cannot constitute cause to excuse the default in federal habeas.

501 U.S. at 756-57.

As to petitioner's reliance on <u>Martinez</u>, there, Arizona did not allow a state criminal defendant to present a claim of ineffective assistance of trial counsel on direct appeal. 132 S.Ct. at 1313, but could assert such claims in state collateral review proceedings. <u>Id.</u> In <u>Martinez</u>, the petitioner's post-conviction counsel failed to raise any claims of ineffective assistance of trial counsel in petitioner's first collateral proceeding. <u>Id.</u> As a result when the petitioner filed a second state post-conviction proceeding with claims of ineffective assistance of trial counsel the second petition was dismissed, and the state appellate court affirmed the dismissal. <u>Id.</u> at 1314. In his subsequent federal habeas petition, the state prisoner asserted claims of ineffective assistance of counsel at trial and in the first state collateral proceeding. <u>Id.</u>

Although the Supreme Court did not establish a constitutional right to post-conviction counsel, <u>Martinez</u> "qualifies <u>Coleman</u> by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." <u>Id.</u> at 1315. The Supreme Court defined "initial-review collateral proceedings" as proceedings "which provide the first occasion to raise a claim of ineffective assistance at trial." <u>Id.</u> The Supreme Court then explained that:

> The rule of <u>Coleman</u> governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.
>
> In addition, the limited nature of the qualification to <u>Coleman</u> adopted here reflects the importance of the right to the effective assistance of trial counsel and Arizona's decision to bar defendants from raising ineffective assistance claims on direct appeal. Our holding here addresses only the constitutional claims presented in this case, where the State barred the defendant from raising the claims on direct appeal.

Id. at 1320. (citations omitted). In a word, Martinez exception applies only to those states which "deliberately choos[e] to move trial-ineffectiveness claims outside the direct appeal process, where counsel is constitutionally guaranteed." Id. at 1318.

Respondent argues that in Tennessee, unlike in Arizona, "there is nothing barring a defendant from bringing an ineffectiveness claim in a direct appeal," citing State v. Smith, No. E2010-00549-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 830, at *35 (Tenn. Crim. App. Nov. 14, 2011); State v. Young, No. E2010-00849–CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 823, at *34 (Tenn. Crim. App. Nov. 9, 2011); State v. Braxton, No. M2009-01735-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 674, at *50 (Tenn. Crim. App. Aug. 26, 2011). The Tennessee Supreme Court reversed a conviction on direct review of an ineffectiveness claim where the trial court held an evidentiary hearing on that claim. State v. Honeycutt, 54 S.W.3d 762, 766-69 (Tenn. 2001).

Yet, Tennessee courts also discourage consideration of ineffective assistance of counsel claims on direct appeal, given the preferable evidentiary mechanisms in post-conviction proceedings. State v. Blackmon, 78 S.W.3d 322, 328-29 (Tenn. Crim. App. 2001) ("ineffective assistance of counsel claims should normally be raised by petition for post-conviction relief"). In Martinez, the Supreme Court expressly recognized that "[d]irect appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the [ineffective assistance of trial counsel] claim." 132 S.Ct. at 1318.

To be sure, Martinez has been held not to apply to Tennessee's system Sutton v. Colson, No. 3:07-cv-00030 (E.D. Tenn. Sept. 20, 2012); see also Banks v. Workman, --- F.3d ----, 2012 WL 3834733 *13 (10th Cir. 2012) (Martinez applies only when "the State barred the defendant from raising the claims on direct appeal," so that post-conviction proceedings are the petitioner's first

opportunity to present the claim); Ibarra v. Thaler, 687 F.3d 222, 227 (5th Cir. 2012) ("Ibarra is not entitled to the benefit of Martinez for his ineffectiveness claims, as Texas procedures entitled him to review through counseled motions for new trial and direct appeal."); Dansby v. Norris, 682 F.3d 711, 729 (8th Cir. 2012) ("Martinez does not apply here, because Arkansas does not bar a defendant from raising claims of ineffective assistance of trial counsel on direct appeal.").

In Leberry, the Honorable Kevin Sharp of this District reasoned as follows on Martinez's in applicability to Tennessee's system:

> Martinez dealt with Arizona law which does not permit the argument "on direct appeal that trial counsel was ineffective," but "instead requires that claims of ineffective assistance at trial to be reserved for state collateral proceedings." Id. at 1314 (quoting, State v. Spreitz, 202 Ariz. 1, 39 P.3d 525, 527 (2002)). In contrast, in Tennessee, "there is no prohibition against litigation of ineffective counsel claims on direct appeal, as opposed to collateral proceedings." State v. Monroe, 2012 WL 2367401 at *4 (Tenn.Crim.App. June 22, 2012).

> Martinez has been read as providing a narrow exception to traditional procedural default rules as applied to ineffective assistance of trial counsel claims, and as limited to situations where the state bars a defendant from raising an ineffective assistance of trial counsel claim on direct appeal. See, Ibarra v. Thaler, 2012 WL 2620520 at *2 (5th Cir. June 28, 2012); Gill v. Atchison, 2012 WL 2597873 at *5 (N.D.Ill. July 2, 2012). Here, Petitioner was permitted under state law to raise his claims of ineffective assistance of counsel on direct appeal, and it is of note that his appellate counsel was different from his trial counsel. See, Arthur v. Thomas, 2012 WL 2357919 at *9 (N.D.Ala. June 20, 2012) (Martinez does not provide relief where petitioner "could have obtained a review of his ineffective assistance of trial counsel claims with the aid of counsel different from his trial counsel in his direct appeal").

> The Court acknowledges that an analogy can be drawn between this case and Martinez because the post-conviction proceeding in Martinez was the first opportunity to raise the ineffectiveness of trial claim, and, just as here, the first opportunity was on direct appeal. However, the fact that appellate counsel can raise ineffectiveness of trial counsel claims on direct appeal does not mean that the failure to do so automatically amounts to ineffectiveness on the part of appellate counsel. To the contrary, ineffective assistance claims are routinely raised in the first instance in post-conviction proceedings in Tennessee because raising the claim "on direct appeal is risky," Young v. State, 2010 WL 2291086 at *2 n.1 (Tenn.Crim.App. June 8, 2010), and "fraught with peril[.]" Monroe, 2012 WL 2367401 at *4. This is

16

significant because the Supreme Court in Martinez made it abundantly clear that it was making an equitable and not a constitutional ruling, and this Court believes that the equities of concern in Martinez do not extend to situations where, as here, a petitioner is represented in his post conviction proceeding by yet another attorney who is free to make the ineffectiveness of trial counsel claim. See, Arthur, 2012 WL 2357919 at *9 (noting that Martinez does not apply where a petitioner can raise his ineffective assistance of counsel claim not only on direct review but also in his counseled first collateral challenge).

To the extent Petitioner's claim is that the ineffectiveness of his appellate counsel served as the basis for the default of his ineffectiveness of trial counsel claim, that issue was never presented to the state court. The Court reads nothing in Martinez which abrogates the rule that a petitioner is procedurally barred from making a claim where the alleged cause for the default is not presented to the state court. See, Lott v. Coyle, 261 F.3d 594, 608–09 (6th Cir.2001) ("Lott never presented the state courts with an opportunity to review his ineffective-assistance-of-appellate-counsel claim as cause for the default of his jurisdiction claim, and thus, is procedurally barred from making such an argument now.").

Petitioner's first objection is, therefore, overruled. However, because of the newness of the Martinez decision and the absence of controlling authority as to its applicability in Tennessee, the Court will issue a Certificate of Appealability solely on the question of whether, based on Martinez, Petitioner can show cause for the procedural default of his ineffective assistance of trial counsel claims.

2012 WL 2999775 at *1-2.

Given Martinez's equitable approach and Tennessee courts' preference for these ineffective assistance of counsel claims being asserted in state post conviction proceedings, the Court concludes that Martinez's application to Tennessee's post-conviction system should be based upon the facts of each case, namely whether the facts underlying this type of the new claim were reasonably known to Petitioner or his trial counsel during the trial to enable so as Petitioner or his counsel to preserve the issue for the trial record and his direct appeal. This fact based approach to Martinez's application would discourage any attempted sabotage of the state trial and direct appeal process by Petitioner withholding proof that may later cause a conviction to be set aside. There are not any facts to establish here that Petitioner or his trial or post-conviction counsel knew of McNeal's testimony

17

about Graves's exculpatory statement that his younger brother robbed and beat him. Thus, applying Martinez's equitable rule, the Court concludes that Petitioner has shown cause for this procedural default.

Yet, Petitioner must also prove prejudice to excuse his post-conviction counsel's failure to present this claim to the state court. Petitioner must prove that he was "actually prejudiced by the alleged constitutional error," Maupin, 785 F.2d at 138. The Supreme Court refers to the definition of "prejudice," as "expressly leaving to future cases further elaboration of the significance of that term." United States v. Frady, 456 U.S. 152, 168 (1982) (quoting Wainwright, 433 U.S. at 91). Prejudice can be demonstrated by a showing of ineffective assistance of counsel. Hill v. Lockart, 474 U.S. 52, 58-59 (1985).

A directly related issue to prejudice is Petitioner's contention that his proof of his actual innocence of the offense also excuses his procedural default. Actual innocence is an exception to the procedural default doctrine because such a showing would result in a fundamental miscarriage of justice. Sawyer, 505 U.S. at 339. If the actual innocence claim is based upon newly discovered evidence, then Petitioner's showing of actual innocence "must be truly persuasive" or "extraordinarily high" to show a "constitutionally intolerable event" as well as the lack of an available state remedy. Herrera v. Collins, 506 U. S. 390, 417, 427 (1993). Where the claim of actual innocence is premised upon a trial with error, then a different and lesser standard of judicial review of "sufficient doubt" applies. As the Supreme Court stated in Schlup v. Delo, 513 U.S. 298 (1995), in contrast to Herrera, where a petitioner

> . . . accompanies his claim of innocence with an assertion of constitutional error at trial. For that reason, [petitioner's] conviction may not be entitled to the same degree of respect as one, such as Herrera's, that is the product of an error-free trial. Without any new evidence of innocence, even the existence of a concededly meritorious

constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim. However, if a petitioner such as [the petitioner] presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

Consequently, [petitioner's] evidence of innocence need carry less of a burden. In Herrera, (on the assumption that petitioner's claim was, in principle, legally well founded), the evidence of innocence would have had to be strong enough to make his execution "constitutionally intolerable" **even if** his conviction was the product of a fair trial. For [petitioner], the evidence must establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice **unless** his conviction was the product of a fair trial.

Id. at 316 (alterations added, emphasis in original).

In Schlup, the Court addressed the standard of proof that a federal petitioner would have to

show to establish the actual innocence exception to the procedural default rule in non-capital cases.

In contrast, for cases other than death penalty cases, the Court in Schlup applied the standard in its

earlier Carrier decision stating:

[W]e hold that the Carrier "probably resulted" standard rather than the more stringent Sawyer standard must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims.

The Carrier standard requires the habeas petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." 477 U.S. at 496, 106 S.Ct. at 2649-2650. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. **The petitioner thus is required to make a stronger showing than that needed to establish prejudice. At the same time, the showing of "more likely than not" imposes a lower burden of proof than the "clear and convincing" standard required under Sawyer. The Carrier standard thus ensures that petitioner's case is truly "extraordinary,"** McCleskey, 499 U.S. at 494, 111 S.Ct. at 1470, while still providing petitioner a meaningful avenue by which to avoid a manifest injustice.

Carrier requires a petitioner to show that he is "actually innocent." As used in Carrier, actual innocence is closely related to the definition set forth by this Court in Sawyer. To satisfy the Carrier gateway standard, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.

Several observations about this standard are in order. The Carrier standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the Carrier standard, we believe that Judge Friendly's description of the inquiry is appropriate: the habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."

The consideration in federal habeas proceedings of a broader array of evidence does not modify the essential meaning of "innocence." The Carrier standard reflects the proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt. See In re Winship, 397 U.S. 358, 90 S.Ct. 1068. Indeed, even in Sawyer, with its emphasis on eligibility for the death penalty, the Court did not stray from the understanding that the eligibility determination must be made with reference to reasonable doubt. Thus, whether a court is assessing eligibility for the death penalty under Sawyer, or is deciding whether a petitioner has made the requisite showing of innocence under Carrier, the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence.

Id. at 326-28 (footnotes omitted) (emphasis added).

For a claim based upon newly discovered evidence, Petitioner's showing "must be truly persuasive" or "extraordinarily high" to show a "constitutionally intolerable event" as well as the lack of an available state remedy. Herrera v. Collins, _ U.S. _, 113 S.Ct. 853, 856, 870, (O'Connor, J., concurring). As Supreme Court explained, "the miscarriage of justice exception is concerned with actual as compared to legal innocence," Sawyer, 505 U.S. at 339, and determine whether "refusal to consider the defaulted claim on federal habeas carries with it the risk of a manifest

miscarriage of justice." Smith v. Murray, 477 U.S. 527, 538 (1986). A petitioner fails to persuade a federal court to look past the cause and prejudice test "[w]hen the alleged error is unrelated to innocence, and when the defendant was represented by competent counsel, had a full and fair opportunity to press his claim in the state system, and yet failed to do so in violation of a legitimate rule of procedure." Id. at 538.

Upon reviewing Petitioner's proof of prejudice, the Court concludes that McNeal's testimony is not credible. McNeal who was then Petitioner's common law wife, was present at the Petitioner's arrest and was aware of his charge of robbing Graves. Within a week of the robbery, McNeal insists that Graves made his statement to her that his younger brother actually robbed him. In fact, McNeal who was present at Petitioner's arrest could not recall if she told the police officers about Graves's statement when the officers arrested Petitioner. Yet, despite Petitioner's trial and direct appeal as well as his state post conviction proceeding, McNeal never informed Petitioner or his counsel about Graves's statement. Petitioner did not call his state trial counsel or post conviction counsel to demonstrate their awareness of McNeal's testimony. Of course, the police officer knew, as did Petitioner and his trial counsel, that Graves may have initially referred to his brother as the assailant who robbed him. McNeal admitted her prior convictions of multiple felonies involving dishonesty. Petitioner's family currently has custody of McNeal's and Petitioner's son. Thus, the Court concludes that McNeal's testimony is not credible nor sufficient to establish prejudice to excuse Petitioner's procedural defaults on his actual innocence. Thus, the Court concludes that Petitioner's new claim of ineffective assistance of counsel is procedurally defaulted. As to Petitioner's showing of actual innocence to excuse this procedural default, for the reason that Petitioner's proof does not

establish prejudice, the Court also concludes that such proof does not meet the higher standard of actual innocence to excuse a procedural default.

### 3. Petitioners Exhausted Claims

For his exhausted claims of ineffective assistance of counsel, Petitioner contends that his state trial counsel's strategy was flawed and the state courts' ruling on those claims are unreasonable applications of federal law. Respondent contends that the State courts reasonably decided Petitioner's exhausted claim by applying federal law.

### E. Review of the State Record

In his post conviction appeal, the Tennessee Court of Criminal Appeals made the following findings of fact on Petitioner's ineffective assistance of counsel claim:

> The petitioner testified that trial counsel was appointed to represent him at the general sessions level and continued to do so through the direct appeal process. According to the petitioner, he asked trial counsel to provide him with copies of discovery materials, but trial counsel failed to do so. The petitioner testified that he only received discovery after he filed a complaint with the Board of Responsibility and that he did not receive the materials until after trial. After viewing the discovery, the petitioner believed that certain materials could have been used to aid him at trial, specifically the 911 tape. On cross-examination, however, the petitioner acknowledged that he had heard the tape immediately prior to trial and stated that he instructed trial counsel he wanted the tape played but that trial counsel refused because he felt it was harmful to the case.
>
> The petitioner also testified that trial counsel only visited him in jail on one occasion, that being the evening before trial. Moreover, according to the petitioner, when trial counsel met with him on court dates, trial counsel was rushed and did not spend enough time discussing the case. The petitioner further testified that he attempted to call trial counsel on multiple occasions but was only able to leave messages with trial counsel's secretary, which were not returned.
>
> The petitioner testified that he informed trial counsel that he had an alibi for the time the crime was committed, specifically his employer. The petitioner stated that trial counsel failed to pursue this possible defense. He also stated that trial counsel failed to inform him that he would be sentenced at 100% if convicted as a violent offender, telling him only that he was looking at "a lot of time." He also testified that trial

counsel did not hire an investigator and that several areas were not investigated sufficiently. Specifically, he testified regarding a starter pistol found in the victim's possession, the fact that the victim was on medication, previous problems in the relationship between the victim and the petitioner, and the identity of the second assailant.

Trial counsel testified and contradicted the petitioner's testimony on several points. According to trial counsel, he provided the petitioner with copies of discovery on two occasions, in addition to a third time after the complaint was filed with the Board of Professional Responsibility. He also testified that he sent the petitioner a copy of the statute which stated he would be serving the sentence at 100% if convicted. Trial counsel testified that he spoke with the petitioner multiple times on the telephone, exchanged written correspondence with him, and often spoke with the petitioner's sister about the case.

With regard to an alibi, trial counsel testified that the petitioner never informed him that his employer was a potential alibi witness. According to trial counsel, the petitioner initially informed him that he was at a wrestling match when the crime occurred. However, the petitioner later admitted that he was not there, so no alibi defense was pursued. Trial counsel testified that he conducted a preliminary investigation of the case by speaking with the detective. He also attempted to speak with the victim, but the victim refused to speak with him. Trial counsel testified that he and the petitioner discussed trial strategy and felt that the best theory of defense was to attack the credibility of the victim based upon the discrepancies in the victim's identification of a suspect and his previous drug convictions. According to trial counsel, he cross-examined the victim with regard to these discrepancies and was "pretty tough" on him. Trial counsel also testified that he received a copy of the 911 tape only a few days prior to trial. He stated that he and the petitioner listened to the tape and, because it portrayed the victim's severe injuries, they made the decision not to utilize the tape.

\* \* \*

We, likewise, find nothing in the record to preponderate against the trial court's finding that trial counsel adequately investigated the facts of the case. Trial counsel specifically testified that he spoke with the investigating officer and attempted to speak with the victim. Just as found by the trial court, based upon his investigation, trial counsel chose to pursue what he believed to be the best possible theory of defense. This was a matter of trial strategy that cannot be "second guessed" or judged in hindsight by this court. Adkins, 911 S.W.2d at 347. We further note that, as part of that strategy, trial counsel extensively cross-examined the victim with regard to several of the issues the petitioner now claims that trial counsel failed to investigate, such as the victim's possession of a starter pistol and the conflicts in the victim's identification of the perpetrators.

Fenton, 2008 WL 4457051 at \*3-6.

## F. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See generally Lindh v. Murphy, 521 U.S. 320 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id.

Moreover, the Supreme Court stated that under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. Yet, the Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A

24

state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5 th Cir. 1996)).

To establish ineffective assistance of counsel, Petitioner must demonstrate that under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 695 (1984). As the Supreme Court has explained:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

25

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decision, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 690-91.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691 (emphasis added). Counsel's failure "to conduct constitutionally adequate pretrial investigation into potential evidence" can "hamper[] [their] ability to make strategic choices." Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005). A court must examine not only to the individual errors of counsel, but must also view the effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, 2000 WL712376 *3 (6th Cir. May 23, 2000).

To establish prejudice due to his counsel's errors or omissions, Petitioner must establish a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in

the outcome. Williams, 529 U.S. at 390-91. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694.

Petitioner argues that trial counsel's assessment of the 911 tape was unreasonable and "made no sense" because the issue of identity was more important than the victim's injuries. Petitioner argues that his trial counsel did not cross examine the victim on his statements about his assailants on the 911 tape and transcript of the 911 tape. As evincing the unreasonableness of the State appellate court's findings and conclusions, Petitioner cites his state post conviction testimony that he told his post conviction counsel to investigate Ms. McNeal, and his post-conviction counsel purportedly asked specific questions about McNeal at the state post-conviction hearing. (Docket Entry No. 18-8 at 29). Yet, that record reflects that McNeal was cited as introducing a person named "Jamie" to Graves and the "lady" to whom Petitioner referred for investigation was an employee at a neighborhood store. Id. at 29-30. There was trial proof that Graves initially identified other individuals as his assailants: first in his 911 call responding to a request for a description of the assailants that ". naw . . .no" before stating that "they were white . . . and uh . . . and one was black," (Docket Entry No. 18-6, at 15-16), In a police report on the same evening, Graves stated one of his assailants was "Joshua" who lived on Elm Street. (Docket Entry No. 18-3, Trial Transcript at 40-42 and Docket Entry No. 18-1, Police Report, at 77-79). Graves's brother, Joshua, lived on Elm Street. (Docket Entry No. 18-3, Trial Transcript, at 40-41). As to these omissions, the trial record establishes that the victim's reference to Joshua was introduced at trial and was found to be the result of the police officer's error. 2006 WL 1896363 at *2. Graves, the victim testified at trial that his reference to Joshus as the assailant was a mistake.

The victim admitted that he did not immediately identify the defendant as one of the assailants, explaining that he was "dazed and confused" as a result of his injuries. While acknowledging that "Joshua" was listed in the police report as "suspect number one," the victim denied telling police that anyone by that name had committed the robbery. The victim explained that during his initial interview with police, he made reference to his brother, Josh, because the defendant had mentioned his name as his source of knowledge about the tax refund.

Fenton, 2006WL1996363 at *1.

The state court found that trial counsel and Petitioner made a joint strategic decision not to introduce the 911 tape because portions of the 911 tape were prejudicial with the victim's voice evincing pain. Fenton, 2008 WL 4457051 at *5. Yet, the state court found that the jury were aware of the victim's different statements about his assailant, the victim's initially inability to identify his assailants and the victim's reference to his brother.

Petitioner also states that the victim knew Petitioner for 15 years and a "few days after the robbery, the victim telephoned the defendant, who denied participation in the robbery but said, "I kept the dude from beating your ass." Id.

With these facts, the Tennessee courts could reasonably conclude that Petitioner and his counsel made a strategic decision with regard to the 911 tape. Thus, the Court concludes that the Petitioner has not carried his burden to justify the relief on this claims.

### Insufficiency of the Evidence

For this claim, Petitioner contends that the State's proof consisted of (1) the testimony of a convicted drug dealer, who had a vendetta against Petitioner and the victim's fiancé and (2) the victim's failures to identify Fenton during the 911 call and later that evening during police interviews; and (3) the lack of medical of physical evidence tying Petitioner to the robbery. (Docket Entry No. 17, Amended Petition at 13-14).

On Petitioner's direct appeal, the Tennessee Court of Criminal Appeals addressed this claim after its analysis of the proof at Petitioner's trial.

> Here, the victim testified that the defendant was one of the men who forcefully entered his residence. He recognized the defendant, who "smashed" his head with a nine millimeter handgun, demanded money, and threatened his life. The defendant struck the victim a second time with the gun, breaking his jaw and shattering his teeth. According to the victim, the two men took money, jewelry, a cell phone, keys, and a jacket from the victim. While there was evidence that the victim failed to initially identify the defendant as the perpetrator, he explained that he was "dazed and confused" as a result of his injuries. Only two days later, the victim named the defendant as one of his assailants and, three weeks after that, identified the defendant in a photographic lineup. The jury accredited the testimony of the state's witnesses, as was its prerogative. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn.Crim.App.1995). Under these circumstances, it is our view that the evidence was sufficient to support the convictions.

Fenton, 2006WL1896363 at * 4.

For relief on a Fourteenth Amendment claim on insufficient evidence, the Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), set forth the standard for reviewing the legal sufficiency of the evidence in support of a conviction.

> . . . [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether **it** believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, **the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.** This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. **Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.** The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

443 U.S. at 318-19 (emphasis added with footnotes and citations omitted).

A presumption of correctness obtains in determining whether there exists sufficient evidence to support a conviction. If any rational finder of fact would accept the evidence as establishing each essential element of the crime, the Jackson standard of review is satisfied. Jackson, 443 U.S. at 324 (1979). The rule concerning reasonable inferences applies with equal force to historical facts. Parke v. Raley, 506 U.S. 20, 35-36 (1992) (involving the challenge to a prior conviction that resulted in enhancement of a sentence).

Given the jury's crediting of the testimony of the State's witnesses, the Court concludes that the Tennessee state courts could conclude that the evidence was sufficient to support Petitioner's conviction. For these reasons, the Court concludes that Petitioner has not carried his burden to warrant habeas relief on his insufficiency of the evidence claim.

An appropriate Order is filed herewith.

**ENTERED** this 25 day of February, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JAMES FENTON, JR.,          )
                                 )
      Petitioner,          )        Case No. 3:09-1057
                                 )        Chief Judge Haynes
v.                             )
                                 )
RONALD COLSON, Warden,      )
                                 )
      Respondent.       )

## O R D E R

In accordance with the Memorandum filed herewith, Petitioner's petition for the writ of habeas corpus (Docket Entry No. 17) is **DENIED**. This action is **DISMISSED** with prejudice. Petitioner is **GRANTED** a Certificate of Appealability on his non-defaulted claims.

This is the Final Order in this action.

It is so **ORDERED**

**ENTERED** this ___25th___ day of February, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court